T.C. Summary Opinion 2003-130

UNITED STATES TAX COURT

THOMAS E. TRUSKOWSKY AND SUSAN L. TRUSKOWSKY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14066-01S.          Filed September 15, 2003.

<u>Harry D. Shapiro</u> and <u>Christopher J. Pippett</u>, for
petitioners.

<u>Innessa Glazman</u> and <u>Warren P. Simonsen</u>, for respondent.

DEAN, <u>Special Trial Judge</u>:  This case was heard under the
provisions of section 7463 of the Internal Revenue Code as in
effect at the time the petition was filed.  Unless otherwise
indicated, all other section references are to the Internal
Revenue Code in effect for the years at issue.  The decision to

be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined deficiencies in petitioners' Federal income tax of $17,656 for 1996 and $19,849 for 1997. The issue for decision is whether petitioners' business losses constitute passive activity losses. The amount of petitioners' allowable itemized deductions and personal exemptions will be determined by our disposition of the contested issue.

The stipulated facts and exhibits received into evidence are incorporated herein by reference. At the time the petition in this case was filed, petitioners resided in Moatsville, West Virginia.

## Background

### Petitioners' Vocations

During the years 1996 and 1997, petitioners resided in Trappe, Pennsylvania, and both were full-time employees at a large computer software corporation, the Oracle Corporation (Oracle). Petitioner Susan Truskowsky was a program manager in the Program Management Group at Oracle Consulting. Her job required her to travel to projects around the country, mostly in the Mid-Atlantic region and to Dallas, Texas. In 1996, petitioner Thomas Truskowsky was employed as senior principal consultant for Oracle. In 1997 he became a technical manager.

Mr. Truskowsky commuted to central New Jersey from Trappe, Pennsylvania, every day.

Petitioners' Cattle Breeding Activity

Petitioners' cattle breeding activity began in 1994, when they bought their first cows. They were "Limousin" cattle, a beef breed from France. Petitioners decided to go into the Limousin cattle business after considering other breeds of cattle.

### The Farm

Petitioners needed a place to board their cattle as they did not own a farm during the years in issue. Petitioners learned about K-C Delight Farm (K-C) from a local newspaper that advertises to farmers. They visited K-C and other farms before choosing K-C. Chester Deitch, who operated K-C, did not own the farm, but rented it. He operated K-C primarily as a "multiple acreage" general and dairy farm. Near his home and included in Mr. Deitch's farmland rental was a parcel of land where he boarded petitioners' cattle. Mr. Deitch maintained approximately two dozen cattle of his own on the same parcel where he boarded petitioners' cattle. Mr. Deitch maintained his and petitioners' animals in different paddocks. Petitioners' animals had their own shelter and automatic watering systems.

Mr. Deitch did not live on the parcel of property where he kept petitioners' cattle, at 117 Simmons Road. There were,

however, boarders in the house at that location, and Mr. Deitch's brother, who helped him on the farm, lived on Simmons Road in the "Summer house". As the Simmons Road location was somewhat isolated and Mr. Deitch and his brother had animals, tools, and equipment that they needed to keep secure, there was an understanding that the tenants would keep an eye on the farm for Mr. Deitch and let him know if they saw someone come onto the property.

Mr. Deitch lived nearby in a house on Deitch Mill Road. His farm on Deitch Mill Road was used to keep dairy cows. According to Mrs. Truskowsky, she "didn't actually go there very often".

The Agreement

Mr. Deitch had an oral agreement with petitioners to board their animals in the sheltered barn and pasture paddocks, and to feed and "care" for their animals for $1 per day, per head of cattle. The agreement continued for about 2-1/2 years, from Spring of 1995 until February of 1998. The number of animals boarded varied from week to week and month to month from about 15 to 20 head. Mr. Dietch fed the cattle twice a day. They were fed silage hay and supplemental grain, some of which was grown by Mr. Deitch on his farm. Through the daily contact for feeding, the animals were observed for general health and veterinary needs. If Mr. Deitch detected problems that were not too complicated, he gave them any needed shots or other treatment.

If a veterinarian was required, he generally contacted the veterinarian. He would also contact petitioners when the veterinarian was needed, as they were responsible for the resulting expenses. Mr. Deitch estimates there were from 8 to 10 calves born to petitioners' animals during a year. He, his wife, or other family member was present for the births. He spent, on average, about 1-1/2 hours a day with petitioners' animals, feeding and observing them, and performing other miscellaneous tasks.

Mr. Deitch did not invoice or bill petitioners under the oral agreement, but petitioners kept track of the number of cattle present at K-C during each month in 1996 and 1997 and, generally, paid accordingly.

Veterinary Breeding Services

From time to time during the period at issue, petitioners' cattle received veterinary services at some distance from K-C. The services included in vitro fertilizations and embryo transfers, techniques which particularly interested petitioners. In 1996, some of the cattle were transported to a facility called Em Tran in Elizabethtown, Pennsylvania. In 1997, cattle were sent to both Em Tran and Genetic Visions in Coatesville, Pennsylvania.

One or both of petitioners visited Em Tran about 8 times over 2 years, and they went to Genetic Visions about 14 times in

1997. When petitioners went to Em Tran they checked the health of their cattle and visited Dr. Henderson at the facility to receive instruction on the "embryo process, the in vitro process." They also discussed these matters with Dr. Evans at Genetic Visions. At first, petitioners came to Genetic Visions together, then sometimes Mr. or Mrs. Truskowsky would come alone, as their schedules permitted. When they came with their animals, petitioners would typically spend from 1 to 6 hours working at the facility.

To get the cattle from K-C to facilities at Em Tran or Genetic Visions, petitioners had to contract a livestock hauler to transport the cattle. The hauler would arrive at the farm, and the cattle were loaded onto the truck, taken to the facility, and unloaded. The process would be reversed to return them to the farm.

### Shows and Auctions

Petitioners participated in buying their Limousin cattle at shows and auctions. Most of their purchases were initiated through a broker using e-mail or fax. But petitioners did attend some shows and auctions in 1996 and 1997.

### Petitioners' Visits to K-C

During the years at issue, petitioners would periodically visit K-C to pay Mr. Deitch and to inspect the health and condition of their animals. Petitioners used grain to attract

the cattle close enough to observe their general condition. Petitioners would sometimes stop on the way to the farm to purchase the grain, which took from a 1/2 hour to 1 hour. The farm, located between Gettysburg and Mechanicsburg, Pennsylvania, was halfway between petitioners' home in Trappe and Mrs. Truskowsky's mother's home near Washington, D.C. The distance between Trappe and the farm is approximately 99 miles. Like Mrs. Truskowsky's mother's home, the Oracle office where Mrs. Truskowsky worked is located in the Washington, D.C. area. It was convenient for Mrs. Truskowsky, when she visited K-C on the weekend, then to go to stay at her mother's house to prepare for the coming work week instead of returning home to Trappe.

Petitioners' Farm Search

Petitioners had a desire to acquire a farm of their own. During 1996 and 1997, they used the services of a real estate agent to aid them in locating one. Petitioners made trips with an agent to look at farm property offered for sale. Petitioners eventually purchased a farm in West Virginia in November of 1998.

Reconstructed Logs and Tax Returns

Although petitioners maintained certain records of their Limousin cattle activity, they did not keep any log of the actual number of hours they devoted to the activity. At the request of their attorneys, petitioners prepared for use at trial documents

that attempt to demonstrate the actual hours they devoted to their Limousin cattle activity during 1996 and 1997.

Petitioners filed with each of their 1996 and 1997 Federal income tax returns, a Schedule C, Profit or Loss From Business, for their cattle activity. For 1996, petitioners reported a Schedule C loss of $45,833. Petitioners for 1997 reported a Schedule C loss of $51,972.

## Discussion

Because the Court decides this case without regard to the burden of proof, section 7491 is inapplicable.

## Passive Activity Losses

Section 469(a) states that a passive activity loss is not allowed to an individual as a deduction for the year in which it is sustained. Section 469(d)(1) defines a passive activity loss as the amount by which (A) the aggregate losses from all passive activities for the taxable year exceed (B) the aggregate income from all passive activities for such year.

Passive activities are those activities which involve the conduct of a "trade or business" in which the taxpayer does not "materially participate." Sec. 469(c)(1). The term "trade or business" for this purpose means any activity in connection with any trade or business or "any activity with respect to which expenses are allowable as a deduction under section 212." Sec. 469(c)(6)(B).

Material Participation

Section 469(h)(1) provides that generally an individual shall be treated as materially participating in an activity only if he or she is involved in the operations of the activity on a basis that is "regular", "continuous", and "substantial". Congress directed the Secretary of the Treasury (Secretary) to prescribe such regulations as may be necessary or appropriate to carry out the provisions of section 469, including regulations that specify what constitutes material participation. Sec. 469(l)(1). Both temporary and final regulations relating to the meaning of the terms "participation" and "material participation" have been promulgated under section 469.

The term "participation" means generally "any work done by an individual (without regard to the capacity in which the individual does the work) in connection with an activity in which the individual owns an interest at the time the work is done". Sec. 1.469-5(f)(1), Income Tax Regs. Temporary regulations issued under section 469 provide certain exceptions to the definition of participation. One particular provision, section 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides that work done by an individual in the capacity of an investor in an activity shall not be treated as participation by the individual in the activity unless the individual is involved in the day-to-day management or operations

of the activity.  Work done by an individual as an investor in an activity includes but is not limited to:  (1) Studying and reviewing financial statements or reports on operations of the activity; (2) preparing or compiling summaries or analyses of the finances or operations of the activity for the individual's own use; and (3) monitoring the finances or operations of the activity in a non-managerial capacity.  Id.

Temporary regulations relating to the meaning of the term "material participation" in section 469(h)(1) provide that, in general, an individual shall be treated, for purposes of section 469 and the regulations thereunder, as materially participating in an activity for the taxable year if and only if--(1) The individual participates in the activity for more than 500 hours during such year; (2) the individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year; (3) the individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year; (4) the activity is a "significant participation" activity for the taxable year, and

the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours; (5) the individual materially participated in the activity for any 5 taxable years (whether or not consecutive) during the 10 taxable years that immediately precede the taxable year; (6) the activity is a personal service activity, and the individual materially participated in the activity for any 3 taxable years preceding the taxable year; or (7) based on all of the facts and circumstances, the individual participated in the activity on a regular, continuous, and substantial basis during such year. Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).

In determining whether a taxpayer "materially participated" in an activity, the participation of a spouse shall be taken into account. Sec. 469(h)(5).

Respondent determined that petitioners did not materially participate in the cattle activity and that petitioners' business losses therefore constitute passive activity losses. Petitioners contend that they participated in the activity for more than 500 hours (Test 1), or for more than 100 hours during the taxable year, and that their participation was not less than the participation in the activity of any other individual (Test 3).

Test 1

In the time logs they prepared for trial, petitioners show participation for a total of 777 hours for 1996 and 830.8 hours for 1997 in their Limousin cattle activity.  Of the 777 hours claimed for 1996, 404 are related to trips to K-C.  Of the 830.8 claimed for 1997, 310.5 are related to trips to K-C.

Citing Goshorn v. Commissioner, T.C. Memo. 1993-578, and Toups v. Commissioner, T.C. Memo. 1993-359, petitioners argue that their travel between their home and K-C constitutes "work" done in connection with their cattle activity.  See sec. 1.469-5(f)(1), Income Tax Regs.  The Court recognizes that travel in some circumstances can be "work" done in connection with a trade or business.  In this case, for example, petitioners' travel between K-C and the facilities at Em Tran and Genetic Visions is "work" done in connection with their cattle activity.  The Court, however, disagrees with petitioners' conclusion that all their travel here was "work".

Neither of the cases they cited supports the inclusion of commuting hours as hours of "work" for purposes of section 1.469-5(f)(1), Income Tax Regs.  Commuting is an inherently personal activity and as such does not constitute "work" in connection with a trade or business.  See Fausner v. Commissioner, 413 U.S. 838, 839 (1973) ("We cannot read section 262 of the Internal Revenue Code as excluding such expenses from 'personal'

expenses"); <u>Commissioner v. Flowers</u>, 326 U.S. 465 (1946); sec. 1.262-1(b)(5), Income Tax Regs. (taxpayer's choice to live at a distance from his place of business is personal, and a taxpayer's costs of commuting to his place of business or employment are personal). Petitioners' total claimed hours of "work" must be reduced by the number of hours each spent in the personal activity of commuting between their home in Trappe, K-C, and Mrs. Truskowsky's mother's home near Washington, D.C.

The Court estimates an approximate travel time of 2 hours from petitioners' home to K-C and 2 hours back or to go on to Mrs. Truskowsky's mother's house, a total trip of about 4 hours. For 1996, Mr. Truskowsky estimated that he made 36 trips to K-C, which when multiplied by 4 hours is 144 hours. Mrs. Truskowsky estimated that she made 38 trips and therefore spent about 152 hours commuting to and from the farm. Petitioners spent a total of 296 hours commuting to and from the farm in 1996 that must be deducted from their total claimed hours of work. For 1997, Mr. and Mrs. Truskowsky claimed 27 and 34 trips, respectively, to K-C for a total of 244 commuting hours that must be deducted from their total claimed hours.

Section 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides that work done by an individual in the individual's capacity as an investor in an activity shall not be treated as participation by the individual

in the activity unless the individual is involved in the day-to-day management or operations of the activity. The Court is unable to find from a preponderance of the evidence that petitioners were involved in the day-to-day management or operations of their Limousin cattle activity. The Court finds, therefore, that hours claimed for the activities of "Books" for Thomas (4 for 1996 and 5 for 1997) and Susan Truskowsky (21.5 and 46), "Wire Xfers/Foreign Drafts" (9 for 1996 and 4.5 for 1997) for Susan Truskowsky, "Shows and Sales" for Thomas (25 and 29), and Susan Truskowsky (96 and 69), "Other Travel" for Thomas (2 and 18.5), and Susan Truskowsky (4 and 27.5) and "Farm Purchase" for Thomas (52 and 36), and Susan Truskowsky(67 and 41), may not be counted as participation in the cattle activity. Reduced by the amounts stated, petitioners' participation in their Limousin cattle activity was in both years less than the 500 hours required to qualify under test 1 as material participation.

Test 3

The Court finds that although petitioners did not participate for 500 or more hours, they did participate in the activity for more than 100 hours during the taxable year. In order to qualify under Test 3, however, they must also show that their participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests

in the activity) for such year. Mr. Deitch testified that he participated in petitioners' cattle activity, on average, about 1-1/2 hours day. When his daily participation is multiplied by 365, it is well over 500 hours a year, more than that of petitioners.

At trial there was some testimony and cross-examination suggesting that Mr. Deitch did not contribute as many hours to the activity as that to which he testified. On the other side of the scale, there was testimony and evidence suggesting that petitioners' logs exaggerate the number of hours they contributed to the activity. The result is that the Court finds from a preponderance of the evidence that petitioners' level of participation in their cattle activity did not exceed Mr. Deitch's day-to-day participation in the activity in either year. Petitioners do not meet the requirements of Test 3.

Test 7

Although petitioners have not met the requirements of either of the tests on which they relied in their trial memorandum and at trial, there is an additional test under which they might yet qualify. Based on all the facts and circumstances, if petitioners nevertheless participated in the Limousin cattle activity on a "regular, continuous, and substantial" basis during such year, they have materially participated even if they do not

pass any of the other six tests.    Sec. 1.469-5T(a)(7), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988)(Test 7).

The standard for Test 7 is not explained in the temporary regulations; however, the very structure of the regulations suggests that it will apply only in exceptional circumstances where the more specific and detailed requirements of the other six tests are not met.  It is possible that the other six tests may not be met, yet the taxpayer either works full time in the business, or does all the activities necessary to conduct the business, even though that is a small amount of work compared to other businesses in general.  See H. Conf. Rept. 99-841, 1986-3 C.B. (Vol.4) 148.  It is also true that a taxpayer is more likely materially participating in an agricultural activity if he is conducting the activity at or near his primary residence.  See S. Rept. 99-313, 1986-3 C.B. (Vol. 3) 733.

Petitioners lived almost 100 miles from their Limousin cattle activity, did not perform all of the activities necessary to the conduct of the activity and did not perform the activity on a full-time basis.  In addition, there was another individual who was involved on a daily basis with the activity.  All of the facts and circumstances of this case do not show, by a preponderance of the evidence, that despite not meeting the requirements of the other six tests, petitioners participated in the Limousin cattle activity on a regular, continuous, and

substantial basis during 1996 and 1997.  They do not meet the requirements of Test 7.

## Conclusion

Respondent's determination that petitioners' business losses for 1996 and 1997 constitute passive activity losses is sustained.

Reviewed and adopted as the report of the Small Tax Case Division.

Decision will be entered

for respondent.